No. 25,383.

Annie Menke, *Appellee,* v. Louise C. Duwe, George L. Simpson, Administrator, et al., *Appellants.*

SYLLABUS BY THE COURT.

1. Will—*Written Consent to Husband's Will by Wife—Widow May Deny That Her Consent was Fairly and Understandingly Made—Issue May Be Sustained by Parol Evidence.* After her husband's death a widow may raise an issue of nonconsent to his will, notwithstanding she has executed in statutory form a declaration of consent to the will, and she may sustain the issue by parol evidence, including evidence relating to the information she possessed and her own state of mind when the declaration was executed.

2. Same—*Testamentary Instrument Jointly Executed by Husband and Wife Not Necessarily Contractual in Character.* A testamentary instrument jointly executed by husband and wife, stated to be "our last will and testament," and containing reciprocal testamentary dispositions of the separate property of each, is not necessarily contractual in character, either as a matter of fact or as a matter of law.

3. Same—*Nonexistence of a Contract Fairly and Understandingly Made Fully Proved by Evidence.* A will of the character indicated, and the extrinsic evidence, considered, and *held,* nonexistence of a contract between the de-

visors making revocation by the wife after the husband's death wrongful, was proved.

Appeal from Harper district court; GEORGE L. HAY, judge. Opinion filed December 6, 1924. Affirmed.

*W. W. Schwinn, E. J. Taggart,* and *John Bradley,* all of Wellington, for the appellants.

*T. A. Noftzger, George W. Cox, W. J. Masemore, Robert L. NeSmith,* and *Benjamin F. Hegler,* all of Wichita, and *Donald Muir,* of Anthony, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a widow who had executed with her husband what is commonly designated a joint and mutual will, to secure her rights under the law as sole heir of her husband. She prevailed, and those claiming under the will, who will be referred to as defendants, appeal.

The court returned findings of fact and conclusions of law. A copy of the will and a copy of the court's findings and conclusions are appended to this opinion.

Defendants contend the petition was really one to set aside Menke's will on the ground of undue influence over him exercised by his attorney, Borman, who drew the will. There were, however, allegations in the petition that Mrs. Menke was of advanced age and hard of hearing, that what knowledge she had of the will she gained from listening while Borman read it, and that her consent to it was given without any comprehension of the fact that she was receiving only a life estate in her husband's property, and was devising her property to his relatives. Whether or not these allegations were sufficient to warrant proof of the facts stated in the findings, is not now important. The facts were developed in an investigation which, whatever the formal issues, was sure to be searching to the last degree, and if it may be said that the issues were enlarged, the petition may be treated as amended to conform to the proof.

Defendants criticise the findings of fact for inaccuracy in some minor particulars. The argument is not that the inaccuracies are in themselves of consequence, but that they show the court gave slight attention to the testimony. These criticisms may be passed by. It is asserted, however, that certain findings of fact material to the judgment are not supported by any testimony. Two principal wit-

nesses related the circumstances under which the will came into existence, and under which Mrs. Menke denied that she was concluded by what was done. They were Borman and Mrs. Menke. Their accounts are irreconcilable in vital particulars. There are seeming inconsistencies and perhaps contradictions in Mrs. Menke's testimony. If this court were to attempt to analyze it, weigh it, and deduce findings from it, the attempt might occasion some perplexity. That, however, is not a function of this court on appeal. The witnesses were examined and cross-examined orally in the presence of the district court, which chose to reject Borman's testimony and to accept Mrs. Menke's testimony respecting all matters concerning which they disagreed. Other witnesses gave testimony relating to occurrences subsequent to execution of the will, and from all the evidence the court deduced the findings of fact. All the material findings are sustained by substantial evidence, and at that point this court's interest in the basis for the findings ceases.

Two views of the will are proposed by defendants: first, that Mrs. Menke consented to her husband's will in writing, executed in presence of two witnesses, conformably to the statute permitting a husband to will more than half his property from his wife, so consenting; second, that at her husband's death she became bound by the joint will because it is contractual in character.

Mrs. Menke's consent to her husband's will is no part of the instrument as a will (*Keeler v. Lauer,* 73 Kan. 388, 85 Pac. 541), and must be considered on its own merit. Some differences between consent to a will and election to take under a will are noted in *Weisner v. Weisner,* 89 Kan. 352, 131 Pac. 608. Some analogies between consent and election are noted in *Chilson v. Rogers,* 91 Kan. 426, 137 Pac. 936, in which it was held that consent expressed conformably to the statute is irrevocable. In the Weisner case the syllabus reads:

"In case of an election by a widow to take under the will of her deceased husband it is essential that the probate court explain to her its provisions and her rights under it and also her rights under the law in the event of her refusal to take under the will. But in case of a written consent by her that the husband dispose of more than one-half of his property to others than his wife, it is only essential that she act freely and understandingly.

"When a widow promptly takes steps to have her written consent to the will of her deceased husband set aside, and the court upon sufficient testimony finds that she did not understand its effect upon her property rights and acted under the strong persuasion and implied threat of her husband in his

.last sickness so that such consent was not given freely and understandingly, *held,* that such finding and determination will not be disturbed." (¶¶ 1, 2.)

In the Chilson case the court said:

"It is enough that a writing freely, fairly and legally made shall express the consent of the husband or wife that the other may bequeath or devise more than one-half of his or her property away from the one consenting. . . . Of course, a written consent, like other instruments, will not be valid if it is obtained by deception, undue influence or fraud of any kind. . . . The consent provided for is akin to the ·provision that a widow may elect to take under the law instead of under the will of her husband. . . . It is held that an election freely and intelligently made is a finality which effectually concludes and estops the widow from setting aside her decision or reclaiming the relinquished right." (pp. 428, 429, 430.)

In the case of *Moore v. Samuelson,* 107 Kan. 744, 193 Pac. 369, a wife joined in her husband's will disposing of his property to their children. Her joinder was held to be surplusage, considering the instrument as a will, but good as expression of assent to her husband's will. The syllabus reads:

"When a wife joins in the making of her husband's will devising property to their children, her signature to the will, if made voluntarily and understandingly and in the presence of the requisite witnesses to the will, is sufficient to satisfy the statute requiring the assent of one spouse to the testamentary disposition of property by the other spouse." (¶ 3.)

What was the district court to do at the trial of the case when confronted by the expressions of this court, "freely and understandingly," "freely and fairly," "voluntarily and understandingly"? What it did do was to admit, over objection, testimony given by Mrs. Menke such as the following:

"He [Borman] went up to find out about the Kansas law after the will was written. When he came back he said it was lawful here for women to sign all documents in writing that the man had, and he said it would be right and lawful for me to sign this will—that Mr. Menke could not make a will unless I did [sign]. He worked around there two or three days on the will. Mr. Borman did not say anything to me. When the will was finally completed, he went outside that evening that he was going away, Wednesday evening. He went outside, and read the will in the twilight, and I was hard of hearing. That was on the back porch of our house. Mr. Menke was there too. He only read it over once. It was the only time I ever heard it. I didn't understand how it was. I knew Mr. Menke had made a will. I didn't know I was making a will. . . . I didn't know that in this will I was only getting a life estate in Menke's property. It was never explained. . . . I first learned what the will was from Mr. Borman on the 4th of July. He was sitting in the dining room, and he said to me, 'You are not in this will,' and I said, 'I didn't understand it that way.' . . . He said I could take the rent from the

Menke v. Duwe *et al.*

farms. . . . I could sell that, and that was all. . . . That was the first time I knew that. When I found that out, I got ready to come to Anthony. . . . Mrs. Bradley . . . came over and she read the will to me. We went over it then. She explained it to me."

Borman's testimony brought into sharp relief the question whether Mrs. Menke had genuinely consented to the will and was simply trying to repudiate her consent, and in rebuttal the court permitted her to testify, over objection, as follows:

"I supposed that he was willing one-half of his property to his people, and that he wasn't willing anything that I had. That I would have that for myself. That Mr. Borman said that he went down town to find out about the Kansas law, and that it was necessary for all women to sign documents with the man, and that in order that this will—that my husband could make a will, I would have to sign it. That is what he told me. That at the time she signed the will she thought her husband was disposing of one-half of his property. I thought that he would do what he wanted to with his one-half of the property, and that I had the other one-half for mine. I supposed that I would have the two quarters that were in my name. I didn't suppose that was in the will."

There can be no doubt that it is the policy of the law to give stability to consent to wills. The statute requiring writing, execution and witnessing is in the nature of a statute of frauds and perjuries designed to place expression of assent on a secure footing. This being true, defendants say that if, when the unambiguous writing was read to Mrs. Menke, she did not hear, or did not comprehend, what was read to her, she should have informed herself before signing. It is not disputed that, although she was old and deaf and had certain peculiarities, she was mentally keen, and defendants say that, having signed the instrument, she is not now privileged to declare she did not understand it, or misunderstood it; that aside from her claimed misconception of the nature of the instrument, the only mistake which induced her to sign was a mistake of law, and not of fact; and that findings of fact based on parol evidence impeaching the instrument should not be allowed to stand.

If the writing were one evidencing an ordinary contract between Mrs. Menke and a stranger, defendants' position would be impregnable; but it is not such an instrument. It evidences voluntary relinquishment of a property right secured by the statute that no man while married shall devise or bequeath away from his wife more than half of his property. (R. S. 22-238.) The relinquishment need not relate to a particular will, and there need be no consideration for the relinquishment, not even a provision for the wife's benefit

in the will. (*Ashelford v. Chapman,* 81 Kan. 312, 105 Pac. 534.) The relinquishment is given to and for the benefit of a person who occupies a confidential relation to the one making the surrender; and if consent be given, the right of election, under the strong safeguards with which the statute surrounds election, is surrendered. Therefore, the instrument is not one which defendants may produce and stand upon as conclusive evidence of a transaction which the law presumes to be fair and right. In order that the conclusion of consent may be drawn, there must have been something more than the bare fact of assent expressed in statutory form.

The statutes of the state of Minnesota relating to consent to a will and election to take under a will are similar in legal effect to the statutes of this state relating to the same subjects. In the case of *State ex rel. Minn. L. & T. Co. v. Probate Court,* 129 Minn. 442, a wife assented in writing to four codicils of her husband's will, and the question was whether she was concluded by the writings. In the opinion the court said:

"We take the correct holding to be that when a trust and fiduciary relation exists, as there does between husband and wife, the wife having a legal right in case of the death of her husband to some share in his property and reposing trust and confidence in him, there is cast upon the husband, in taking a consent to the making of his will, or to a codicil to it, the affirmative duty of making to his wife a fair disclosure of his property and her rights, so that her consent will be an actual one, based upon an intelligent knowledge of his property and the effect of her consent, as distinguished from one merely formal. As great a duty of disclosure as that stated is required in antenuptial settlements. If this is not done, and the consent is not fairly and reasonably obtained by putting the wife in possession of the facts which she ought to know in order to determine her course intelligently, she may, after his death, if she proceeds without laches, renounce her consent and elect to take under the statute. If the provision of the statute relative to descents, giving effect to consent by one spouse to the will of another, without a reserved right of election after the death of the other, does not work justly under such a rule it should not work at all. We have in mind no other trust or fiduciary relation at all resembling that here involved where the law requires one party to submit to a surrender, at the instance of the other, of valuable rights, though the surrender is made in compliance with all legal forms, if made in ignorance of the existence of such rights or without fair opportunity for investigation, the other party having full knowledge. The rule stated we adopt." (p. 446.)

It will be observed the Minnesota court fully appreciated the fact that adaptation of the rule governing gifts and other transactions between living persons in confidential relation, to written consent to a will, might encourage bald attempts to repudiate valid

consent. Not being able to foresee all the consequences, this court forbears definite pronouncement respecting the Minnesota rule. There can be no doubt, however, that a wife, making the relinquishment involved in consent to her husband's will, ought to have sufficient information respecting her rights, and the manner in which the will will affect those rights, to enable her to act intelligently, unless she should indicate willingness to act unintelligently. Likewise, there is no doubt that, because of the confidential relationship, the husband, or those claiming through him, should not be privileged to take advantage of a relinquishment given in ignorance of the facts concerning which the wife should have been informed. So much being clear, it seems reasonable to say that, to constitute consent, assent, though in statutory form, must be given understandingly; and that being true, a woman may, after her husband's death, raise the issue of nonconsent to his will, notwithstanding existence of the statutory declaration of consent, and may sustain the issue by parol evidence, including evidence relating to the information she possessed and her own state of mind.

Whether or not Mrs. Menke signed the declaration of consent knowingly was a question of fact, determinable in precisely the same manner as other questions of fact. Borman spent substantially all his time from Monday morning to Wednesday evening in considering and preparing the will. It is a highly involved instrument, of a not very common kind, couched in technical legal phraseology, and is an excellent example of professional art. When the subject of Mrs. Menke's election whether she would take under the will or under the law came before the probate court, the court was required to explain to her the provisions of the will, her rights under it, and her rights in the event of her refusal to take under the will. Mrs. Menke testified the probate judge seemingly did not understand the will, and undertook to read it two or three times before he got it read. It could scarcely be a matter of astonishment if Mrs. Menke did not comprehend it, from listening with dull ears while Borman read it to her just once, without comment or explanation, while sitting in the twilight on the back porch of the Menke home. Borman had not been sent for to draw Mrs. Menke's will. He went to Attica to draw Menke's will, and his conferences during preparation of the document were with Menke. Borman told Mrs. Menke it was necessary for her to sign in order to validate Menke's will, and she believed what he said. Aside from mere existence of the confidential relation,

and aside from the confidence which Mrs. Menke did repose in her husband, it would have been fair to her if Borman had done something in the nature of what the probate court was required to do when the subject of election was before it.

As indicated above, the court has not, in this instance recognized any presumption of impropriety in procuring execution of the declaration of consent, and has not cast the burden upon defendants of showing affirmatively that Mrs. Menke did have the information to which she was entitled when she signed the declaration. The court does hold, however, that it was proper for her to allege and prove that the declaration was not signed understandingly with respect to material matters, that the proof offered to that effect was competent, and that the findings to that effect are well sustained.

There remains the question whether the will evidences a contract between the parties which precludes Mrs. Menke from revoking it as her will, and from electing to take under the law instead of under the instrument as her husband's will. The law upon the subject has been in a state of confusion since July 18, 1769, when Lord Chancellor Camden pronounced judgment in the case of *Dufour v. Pereira*, 1 Dickens, 419. The material portions of the blind report of the case, which contains no copy of the will, follow:

"This cause stood this day for judgment. The case on which the principal question arose, stood thus: Mrs. Camilla Rancer, the wife of Rancer, being entitled to a legacy under the will of her aunt, she and her husband agree to make a mutual will, which they do, and both execute it.

"The husband died; the wife proved his will, and afterwards made another will. And the question was, whether it was in the power of the wife, to revoke the mutual will.

"Lord Camden C.—This question arises on a mutual will of the husband and wife; the will is jointly executed by them.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Consider how far the mutual will is binding, and whether the accepting of the legacies under it by the survivor, is not a confirmation of it.

"I am of opinion it is.

"It might have been revoked by both jointly; it might have been revoked separately, provided the party intending it had given notice to the other of such revocation.

"But I cannot be of opinion that either of them could, during their joint lives, do it secretly; or that after the death of either, it could be done by the survivor by another will.

"It is a contract between the parties, which cannot be rescinded but by the consent of both. The first that dies carries his part of the contract into execution. Will the court afterwards permit the other to break the contract? Certainly not.

Menke v. Duwe *et al.*

"The defendant, Camilla Rancer, hath taken the benefit of the bequest in her favour by the mutual will; and hath proved it as such; she hath thereby certainly confirmed it; and therefore I am of opinion, the last will of the wife so far as it breaks in upon the mutual will, is void.

"And declare, that Mrs. Camilla Rancer, having proved the mutual will, after her husband's death; and having possessed all his personal estate, and enjoyed the interest thereof during her life, hath by those acts bound her assets to make good all her bequests in the said mutual will; . . . " (pp. 419, 420.)

In the case of *Lord Walpole v. Lord Orford*, 3 Vesey Jr. 402, decided in 1797, the Lord Chancellor, Loughborough, who had been of counsel in the Dufour case, told what that case was about:

"The bill stated an agreement in writing contained in an instrument conceived in the form of a will of persons not conversant in the laws of this kingdom, made before a notary public; an agreement perfectly defined with minuteness upon all cases, that could be supposed to occur. The bill prayed performance; and in consequence of the agreement it was contended, that all the effects, that existed, were specifically bound; and it prayed a transfer of the specific stocks, that were the subject of it, and not disposed of, according to that mutual agreement. . . . In the view of the court therefore the mutual will neither was nor by possibility could be considered as the will of Mrs. Reyne. It was considered purely as the will of her husband. There was no probate of it as her will; but on the contrary the will, she made, was proved. Therefore the court considered it not as her testament, but as a contract with her husband for valuable consideration; under which she acted for sixteen or seventeen years; that she had taken the benefit of it for her whole life. Therefore she had accepted the terms; and had bound herself to the conditions, under which all the property was given by the will of her husband. . . . The effect of the agreement was, that the wife had the enjoyment during life, and limited to that, of all the specific interests: she had a limited power of disposing of part of that property: but all, she had, was upon condition, that she should dispose of her own property, that she might have acquired after his death (and she did increase it), upon the dispositions of that will. . . . It was a most minute, distinct and particular, engagement to each other what shall be done after the death of each and of the survivor. It goes even to the specification of what legacies they might give, and of the disposition of plate, watches, jewels and trinkets." (pp. 416, 417, 418.)

The result was, Lord Loughborough declined to recognize the Dufour case as authority in the case before him, which involved reciprocal testamentary instruments. Discussing the claimed agreement between Lord Walpole and Lord Orford, the Lord Chancellor said:

"These plaintiffs now insist upon the agreement, which they state. As to the extent of it, it does not exist anywhere so that I can see, what they agreed

to; but the fact of some agreement is to be implied from the cotemporary execution of the two instruments and the other circumstances. From the co-existence of the instruments and the execution at the same time I do infer, that they had agreed to make, the one a codicil, the other a will. I conclude with the bill, that both considered it an honorable engagement. I cannot direct the execution of an honorable engagement; that leaves the party to dispose, as he pleases; which rests upon nicer points than a court of justice can decide upon. I must say, they meant to impose upon each other a legal and binding obligation; that that was their intention, and they meant to do so. . . . For this court to execute an agreement it is always necessary, that the terms should be clear. Here it is uncertain, whether they meant it to amount to a legal obligation. There is no evidence, nothing, upon which I can obtain a clear and defined solution of that; and I lay it down as a general proposition, to which I know no limitation, that all agreements in order to be executed in this court must be certain and defined: secondly, they must be equal and fair; for this court, unless they are fair, will not execute them: and thirdly, they must be proved in such manner as the law requires. Upon a bill properly framed all these points would occur; and upon such a bill the defendant would undoubtedly have the benefit of demurring. It is enough for me to say, I doubt upon every one of these points. There is great uncertainty with regard to the terms and the extent of the agreement; and particularly, whether it was meant to be absolutely binding. . . ." (pp. 419, 420.)

Lord Camden's two pronouncements, that a mutual will jointly signed by husband and wife is a contract between them which cannot be rescinded except by consent of both, and that such a will—such a contract—is revocable by one alone, provided notice be given the other, cannot both be true, as general statements of principle. A contract irrevocable except by consent of two, may not be revoked upon notice given by one, and a will is not a will unless ambulatory during life of the testator.

Disposition of property by will is a proper subject of contract. If the contract be in substance or effect not to revoke a will, the will as a will is nevertheless revocable, without notice to anybody. It cannot then be probated as the will of the person revoking it and, if the revocation be by means of a second will, the second will is probatable as the will of the testator. The revocation, however, breaches the contract, and the contract is enforcible in equity against the estate of the testator. A single instrument may have a double aspect—a will contractual in character, or a contract testamentary in character. As will it is revocable. As contract it is enforcible, if broken by revocation as will. Unless there be fraud, or a contract broken by revocation, there is nothing which equity may use as a basis of redress for revocation, no matter what the form of the re-

Menke v. Duwe *et al.*

voked will, whether described as joint, or joint and mutual, or other-wise.

Notwithstanding Lord Loughborough's explanation of the Dufour case, it is now being cited as authority for the proposition that a mutual will jointly signed by a husband and wife, giving to each a life estate with remainder over, is its own convincing proof that it was made in accordance with a contract to dispose of the property in the manner stated in the will.

"If two persons make wills, each devising his property to the other, there is no necessary inference that the wills were the result of any mutual or reciprocal agreement or understanding. Such wills might be executed without either party knowing that the other had executed his will; but where the parties execute their wills by the same instrument, it is not possible that such course could be adopted without some previous understanding or agreement between them." (*Frazier v. Patterson*, 243 Ill. 80, 86.)

This assertion lay beyond the boundary of the court's information. Such a thing is not only possible, but occurred in the case now under decision.

Borman testified to this effect: Menke outlined to Borman the kind of will he desired to make. His plan was that his wife should have a life estate in his property, the division of which was to occur after her death. Borman advised him that his wife's consent to such a will would be necessary. Menke and Mrs. Menke talked the matter over, and she said she was satisfied with the life estate, and with the disposition of his property which had been worked out. Menke then turned to his wife and said that, since he wanted to know where all the property was going at his death, and was making his will, she ought to have her will prepared, too. She said all right. Menke then asked her how she wanted her will drawn. She said what they had agreed to [with reference to the scheme of Menke's will] was entirely satisfactory to her, and told Borman to draw her will, and what disposition to make of her property. In the course of their conferences, Menke told Borman he wanted a joint will. Borman hesitated to employ that form, but Menke insisted, and Borman prepared what he repeatedly called "the wills" of Gottlieb and Annie Menke. The result is, Menke conceived his will without reference to what his wife might do, and procured her consent to the scheme of his will, before the subject of a will of her property was mentioned. When it was suggested to Mrs. Menke that she make a will, when she was asked how she would have her will drawn, and when she directed how her own property should be

disposed of by her will, she was free from any agreement or under-
standing with her husband relating to any of those subjects, and the
wills were prepared, not pursuant to antecedent or contemporaneous
contract between the Menkes, but pursuant to the several instruc-
tions which each one gave respecting his own desires. Borman
testified Mrs. Menke did not say a single word to him about any
relatives she might have, and he did not know she had any relatives.
Certain persons were suggested as having possible claims to the
Menke's bounty, and Borman was informed they would not be
named in the wills. Mrs. Menke was content to have her property
go to Menke's relatives, and so, while the two wills were identical
in method of disposing of property, neither was made as a considera-
tion for the other. The court rejected part of Borman's testimony,
and found Mrs. Menke did not understand she was making a will.
Therefore, under no theory of the case could the wills be mutual
or reciprocal in any contractual sense.

In the case of *Bower v. Daniel,* 198 Mo. 289, the trial court found
a husband and wife, aged and infirm, had given to their children
sums of money and articles of property in unequal proportions.
Desiring to dispose of the remainder of their property by will, they
disagreed about its distribution among their children. In settle-
ment and compromise of their differences, they agreed upon the
terms of a will to be jointly executed and, pursuant to the agreement,
did execute the will. In its opinion the supreme court said:

"The court found that the mutual will was made between the husband and
wife in pursuance of a previous arrangement between them, and this we think
is borne out by the will itself, and, there being no evidence to the contrary
before us, that finding cannot be questioned." (p. 320.)

That disposed of the case. The court then went far toward
adoption of the rule that the fact of a joint will with reciprocal
testimonial provisions, establishes a contract not to revoke, by
saying:

"It is evident from the provisions of the mutual or joint will that this aged
or infirm couple, each owning property, made said will together for the purpose
of disposing of and distributing their property equitably among their children
after their death; that the provisions of the will were reciprocal, and that but
for these mutual bequests the parties would in all probability have made
separate wills. After the death of the testatrix, her husband, William Daniel,
accepted the provisions of the will in his favor, and under such circumstances
equity will enforce the provisions of the will against him and all persons hold-
ing under him who took with notice of its provisions, or without value."
(p. 321.)

It is respectfully submitted that the statement, "but for these mutual bequests the parties would in all probability have made separate wills," was derived from the court's knowledge of the findings of fact, and not from the will.

In the case of *Edson v. Parsons*, 155 N. Y. 555, the court considered separate mutual wills. Extrinsic evidence had been introduced, and from the evidence and the wills the court concluded they were not executed pursuant to contract. The syllabus reads:

"A mutual agreement to execute mutual wills is not shown by the fact that persons make similar wills with cross-provisions in favor of the survivor.

"To establish an agreement for mutual wills and defeat the right to revoke a will, there must be full and satisfactory proof of the agreement, which cannot be supplied by presumption." (¶¶ 2, 3.)

In the opinion the court said:

"The wills were similarly made, and hence showed concert of action and similarity of purpose; but not necessarily a binding agreement of such solemnity and far-reaching consequences as the appellant claims. To argue upon the basis that they are mutual wills begs the question. That is a fact to be established by evidence, showing that such was the understanding and the deliberate agreement." (p. 570.)

In the case of *Rastetter v. Hoenninger*, 214 N. Y. 66, the court considered the peculiar provisions of a joint will of husband and wife, and held that, unexplained by extrinsic facts, they indicated a contract to make the will as it was made. Notwithstanding Lord Camden's ruling in the Dufour case, the court declined to hold that the mere fact of a conjoint reciprocal testimonial disposition establishes a contract not to revoke. But the court said, "it may be" such wills "more nearly import a contract than separate mutual wills" such as were involved in Lord Walpole's case and in *Edson v. Parsons*. The court further held that a will as a will is revocable, but as a contract is enforceable in equity if supported by adequate consideration. In the later case of *Morgan v. Sanborn*, 225 N. Y. 454, the court's position relating to the latter subject was made clear by the following statement:

"If it [the contract] is contained in mutual or joint wills later revoked by the survivor, those wills may be carried out, not as wills but as contracts [citing the Rastetter case]." (p. 462.)

The court approves the New York cases to the extent the nature of the decisions has been indicated herein, and to that extent only.

Turning to the Menke will, it will be observed the document contains two separate and distinct wills, beginning respectively, "I,

Gottlieb Menke, give, devise and bequeath," and "I, Annie Menke, give, devise and bequeath." The first item is formal. The last two paragraphs contain administrative details common to both wills, one statement of which was sufficient. Except for these matters, and except for the further economy of reference by the second will to the first for description, the body of each will is complete in itself. The devisors joined in nothing. They made separate wills, each as distinct from the other as if written on separate paper. The structure of the instrument indicates expert draftsmanship, and the draftsman inserted one provision evidently intended to apply to the whole instrument, which reads as follows:

"This will was executed after all matters were thoroughly considered, and disposal of all property is herein made exactly as desired.".

Since care was taken to insert this paragraph in the will, it is fair to assume it tells the whole story. There was thorough consideration and exact expression of intention, but nothing more. If the instrument was the result of contract, under which the making of each will was consideration for making the other, that paragraph was the place in which to state the fact, and there is no such statement. The result is, the instrument itself, although declared to be "our last will and testament," although containing reciprocal testamentary dispositions, and although jointly executed, does not compel the inference that it was contractual in character. Furthermore, if the paragraph referred to had been omitted, and an inference of contract were strongly indicated, existence of a contract pursuant to which the instrument was executed, would nevertheless be a matter of fact, to be established according to the rules stated by Lord Loughborough, and by the New York court of appeals in *Edson v. Parsons*, 155 N. Y. 555, and *Rastetter v. Hoenninger*, 214 N. Y. 66.

Turning to the extrinsic evidence, nonexistence of a contract making revocation by Mrs. Menke after her husband's death wrongful, was proved both by plaintiff and by defendants, and the case stands as a warning against dogmatic judicial declaration that a certain form necessarily expresses a certain reality.

The judgment of the district court is affirmed.

# APPENDIX.

## Will of Gottlieb Menke and Annie Menke.

*Know All Men by These Presents:*

That we, Gottlieb Menke and Annie Menke, of the county of Harper and state of Kansas, being of full age, sound mind and memory, do make, publish and declare this to be our last will and testament, that is to say:

*First.* We direct that all our lawful debts, the expense of our last sicknesses and burials and of the administration of our estate, be first paid; and subject thereto.

*Second.* I, Gottlieb Menke, give, devise and bequeath a life estate in all the property owned by me at the time of my death to my beloved wife, Annie Menke, for the term of her natural life, provided that she survive after my death.

*Third.* I give, devise and bequeath the rest and residue of my estate after her death, including accumulations if any, as follows, to-wit:

First. Two hundred and no/100 dollars to each of the children of my half sister, Rose Mahl.

Second. Five thousand and no/100 dollars to my niece, Mary Streib.

Third. Five thousand and no/100 dollars to Anna Teel, daughter of Mary Streib.

Fourth. Twenty thousand and no/100 dollars to my sister, Leusetta Miller.

Fifth. Five thousand and no/100 dollars to my cousin, Sophia Miller.

Sixth. Five thousand and no/100 dollars to my niece, Louise C. Duwe, of Guttenberg, Iowa.

Seventh. Five thousand and no/100 dollars to Amanda Borman, Guttenberg, Iowa.

Eighth. Three thousand and no/100 dollars to Nellie Duwe, in trust for the use and benefit of her son, Morris F. Duwe, of Guttenberg, Iowa; interest on same and trust fund may, in the sound discretion of trustee, be used for the education of the said Morris F. Duwe, and to be turned over to him when he attains his majority.

Ninth. Three thousand and no/100 dollars to A. H. Borman, in trust for the use and benefit of Maxine L. Borman, daughter of Amanda Borman; interest thereon and trust fund may in the discretion of trustee be used in the discretion of trustee for educational purposes for the said Maxine L. Borman, and the same or balance with accumulations shall be turned over to said Maxine L. Borman when she attains her majority.

Tenth. Three thousand and no/100 dollars to A. H. Borman, in trust for the use and benefit of Roland A. Borman, son of Amanda Borman; interest thereon and principal may in the discretion of trustee be used to educate the said Roland A. Borman, and the same or balance with accumulations shall be turned over to him after he attains his majority. The words "same or" were interlined in two places before the execution of this will.

Eleventh. Five thousand and no/100 dollars to Minnie, daughter of Ernest Menke, of Waseca, Minnesota.

Twelfth. And the balance of my estate with accumulations I give, devise and bequeath to Mary Streib, Anna Teel, Leusetta Miller, Sophia Miller, Louise C. Duwe, Minnie, the oldest daughter of Ernest Menke of Waseca, Minnesota, Nellie Duwe, in trust for the use and benefit of Morris F. Duwe on said terms of foregoing trusteeship to her, to A. H. Borman, in trust for the use and benefit of Maxine L. Borman on same terms of foregoing trusteeship in her favor, to A. H. Borman in trust for the use and benefit of Roland A. Borman under the same terms of the foregoing trusteeship in his favor and Amanda Borman in ten equal shares, share and share alike.

*Fourth.* If my wife does not survive after my death, in that event I give, devise and bequeath all the property owned by me at the time of my death to the same persons to whom I have bequeathed and devised the same in case my wife first takes a life estate in my property, in the same amounts and same shares as the same would have gone to them after the end of her life estate, the amounts and shares to each being the same in each instance, save that there might be some difference in the amount or value of each of the ten shares.

The life estate to my wife is in lieu of the property that would have gone to her if no will, and she expressly consents to the disposition herein made thereof by me. I nominate my wife, Annie Menke, to be the executrix of my will should she survive me, without bonds.

And I, Annie Menke, give, devise and bequeath all the property owned by me at the time of my death to my beloved husband, Gottlieb Menke, for the term of his natural life, and after his death I give, devise and bequeath that portion of my estate remaining, with accumulations if any, in ten equal shares to the persons named in subdivision twelve of part three of this will, share and share alike, and in the event that my husband does not survive after my death, in that event I give, devise and bequeath the property owned by me at the time of my death direct to Mary Streib, Anna Teel, Leusetta Miller, Sophia Miller, Louise C. Duwe, Nellie Duwe, in trust for Morris F. Duwe under same terms as above, A. H. Borman in trust for Maxine L. Borman under same terms as above, A. H. Borman in trust for Roland A. Borman under the same terms as above, and also to Amanda Borman, and also to Minnie, the oldest daughter of Ernest Menke, share and share alike, same being ten shares. The disposition made in the first part of this item goes to the persons last named herein but otherwise first referred to. The said Gottlieb Menke expressly consents to the disposition made of her property herein by his wife, and the said Annie Menke nominates her husband, Gottlieb Menke, as the executor of this will without bonds.

This will was executed after all matters were thoroughly considered, and disposal of all property is herein made exactly as desired.

We authorize, direct and empower the executor of this will acting after our deaths to dispose of and convey all the property then belonging to our estates at private sales under the direction and approval of the court, and after the same has been duly appraised, and we direct that all property so sold be sold to the best interests of our estate and at such times as will insure the best interests of our estates.

And the proceeds of said sales shall be divided and distributed under this will instead of the property itself. Abstracts to be furnished buyers. Stocks and bonds may be taken by legatees at actual value at that time, if same can be agreed upon as a part of their legacies, and otherwise to be sold for actual value at the time of sales, and proceeds divided under will.

In witness whereof we have hereunto subscribed our names at Attica, Kansas, this 29th day of June, A. D. 1920.

|  | (Signed) | GOTTLIEB MENKE. |
|  | (Signed) | ANNIE MENKE. |

## FINDINGS OF FACTS.

At the request of the defendants, and after the trial of the above-entitled action and the argument and examination of the briefs filed on behalf of the plaintiff and defendants, the court makes the following findings of fact:

I. This action was brought on August 9, 1922, by the plaintiff, Annie Menke, widow of Gottlieb Menke, deceased, who departed this life on June 28, 1922, against the defendant, George L. Simpson, as administrator with the will annexed of the estate of Gottlieb Menke and all the beneficiaries named in the will of Gottlieb Menke as hereinafter set out.

II. That on the 29th day of June, 1920, the said Gottlieb Menke and his wife, the said Annie Menke, signed in form an instrument in writing in words and figures following, to-wit: (Here follows a copy of the will.)

Menke v. Duwe *et al.*

III. That at the time said instrument in writing was signed by the said Annie Menke, she was over the age of eighty years; somewhat hard of hearing, with a predisposition to say, "yes, yes," to a person addressing her or interrogating her before she could know the purport of the question of the remark made to her, and at such times she had implicit confidence in her husband, Gottlieb Menke.

IV. That said instrument in writing was signed by the said Gottlieb Menke and Annie Menke under the following circumstances:

At the request of Mr. Menke, Mrs. Menke wrote to A. H. Borman, of Guttenberg, Iowa, requesting him to come to Attica, Kansas, where the Menkes resided, to do some work for Mr. Menke. Mr. Borman was an attorney at law, and his wife's mother, Louise C. Duwe, a cousin of Mr. Menke. In response to said letter Mr. Borman went to Attica, and arrived there at the Menke home on Sunday, and remained there until the following Wednesday. While there Borman spent substantially all of his time with Mr. Menke, considering this instrument. At such times Mrs. Menke was doing her housework, and did not to any great extent participate in the conversations between Mr. Borman and Mr. Menke relating to said instrument in writing. After said instrument in writing was prepared to the satisfaction of Mr. Menke and Mr. Borman, Mr. Borman took it out on the back porch of the house where they resided, it then being evening and rather dark in the house, and there on the porch in the twilight read the instrument in writing to Mr. and Mrs. Menke. Mrs. Menke did not fully understand the instrument in writing as it was read to her. After it was read Mrs. Menke went out and called in two neighbors, and Mr. and Mrs. Menke signed the instrument in writing, and the two neighbors signed it as witnesses. It was then placed in an envelope, sealed up, delivered to Mr. Menke, who put it in his safe in his house. Borman left Wednesday night, and took with him the notes or memoranda with reference to said instrument in writing, including several of the first drafts thereof, one of which being almost an exact copy of said instrument itself as signed, leaving no copy with the Menkes. At the time said instrument was signed by Mrs. Menke, she did not know or understand its contents, except that she understood it to be the last will and testament of Gottlieb Menke.

V. On the day after Borman arrived in Attica, and after the will had been written, he left the Menke house and went down to look up the Kansas law, and when he returned to the Menke home he told Mr. and Mrs. Menke that a husband in Kansas could not convey any part of his real estate by will or deed without the written consent of his wife, and that it would be necessary for Mrs. Menke to sign Mr. Menke's will. At the time that she signed said instrument in writing she did not know that it purported to be her own will, or that it purported to cover the property which she held in her own name.

VI. Mr. Borman attended the funeral of Gottlieb Menke and, on July 3, 1922, Mrs. Menke, accompanied by Mr. Borman, went to Anthony, Kansas, where, in the office of the probate judge, the said instrument in writing was opened and offered for probate as the last will and testament of Gottlieb Menke, deceased, after which the said will was read to Mrs. Menke, and she signed the election to take under the will, although at this time she did not fully understand its provisions. Mrs. Menke and Mr. Borman returned to Attica, and on the same evening Mr. Borman told Mrs. Menke that she did not get anything under the will except the use of the property during her lifetime, whereupon and by reason of said information Mrs. Menke became greatly disturbed, and on her own volition called in a neighbor lady, Mrs. Bradley, and consulted with her about said will. Mrs. Bradley and Mrs. Menke went over the will together, and Mrs. Bradley explained it to Mrs. Menke. The next morning Mrs. Menke returned to the probate court, and applied to have her election set aside, and on the 7th day of July, 1922, the probate court granted her request and set aside said election. At the time said will was opened in the probate court and read to her, Mrs. Menke was still under the impression that the will did not affect any of her own property and that she

got one-half of her husband's property absolutely. and a life estate in the other half.

VII. At all times since the 5th of July, 1922, Mrs. Menke of her own volition and without suggestion on the part of any one sought to repudiate said will in so far as it relates to her own individual property and in so far as it purports to give her written consent that her husband might will away from her more than one-half of his property. Mrs. Menke has done no act inconsistent with such rejection of the will at any time, nor has she accepted any substantial benefits under the will.

VIII. The signature of Mrs. Menke to the will was given under the impression on her part that it was necessary for her to consent to her husband's willing away half of his property to his relatives subject to a life estate in the plaintiff and such signature on the part of Mrs. Menke was not given freely or understandingly.

IX. That at the time Mrs. Menke executed said instrument in writing she relied upon her husband and was induced to sign it believing that he would deal fairly with her and that no advantage would be taken of her by him.

X. That Mrs. Menke did not understand the nature of the instrument at the time she signed it, and did not understand that it affected her property, and did not know that under the terms thereof she was to receive only a life estate in all her husband's property, and did not know that the accumulations of the property would go to the beneficiaries in said will, and that if she had fully understood said will she would not have signed it.

XI. That the property of the said Gottlieb Menke and of his wife had been earned by the joint efforts of both of them after their marriage and removal to Kansas. The estate of the said Gottlieb Menke consisted of farms, bonds and securities at the time of the making of said will and also at the time of his death was approximately $129,867.62, yielding an annual income of from $3,000 to $5,000, and that of Mrs. Menke consisting of 320 acres of land was approximately $20,000, yielding an annual income of about $700.

XII. The court further finds that the said Annie Menke has made a new will since the death of Gottlieb Menke.

XIII. That the will of Gottlieb Menke was executed in accordance with the statutes of Kansas, without any undue influence from any one.

---

## CONCLUSIONS OF LAW.

I. That the will of Gottlieb Menke, in so far as it affects the undivided one-half of all the estate left by Gottlieb Menke, is valid and binding and remains in full force and effect, except that his widow, not having elected to take under the will, cannot and does not receive any life estate in any part of the property, and the remainder is accelerated so that the beneficiaries under said will will take immediately an undivided one-half of that which the will by its terms gives to them after the death of said plaintiff.

II. That the signature of Annie Menke to the will is null and void, and should be vacated and set aside because her consent was not given freely and understandingly.

III. That the property held by Annie Menke in her own name, both real and personal, be restored to her, and the administrator with the will annexed be instructed to deliver the same to her forthwith.