No. 28,242.

NORA WARWICK, *Appellee*, v. F. ZIMMERMAN, as Administrator of the Estate of Lizzie Shew, Deceased, et al., *Appellants*.

(270 Pac. 612.)

Opinion filed October 6, 1928.

R. R. Vermilion, Earle W. Evans, Joseph G. Carey, W. F. Lilleston, Henry V. Gott, E. L. Foulke, James B. Nash and Roy H. Wasson, all of Wichita, for the appellants.

C. W. McVickers and Arch F. Williams, both of Wichita, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action to set aside the joint will of the father and mother of the plaintiff after the death of both of them. There are really only two questions involved: First, Is the will a joint, mutual and reciprocal one, and, if so, can it be set aside after the death of the testators? Second, Did the mother execute the will by reason of undue influence?

The only property involved herein is real estate which stood in the name of and belonged to the mother, who survived the father, and by the terms of the will was devised to benevolent and charitable institutions. The case was tried to the court with an advisory jury. The court adopted the findings of the jury and made additional findings, and concluded in favor of the plaintiff.

The necessary facts for this opinion cannot be better stated than by giving a copy of the findings and conclusions of the court, which are as follows:

"1. This is an action to set aside the joint will of A. L. Shew and Lizzie Shew, brought by Nora Warwick, the only child and heir at law of the testators.

"2. At the time of the making of the will in question, A. L. Shew, the husband, was about eighty-two years of age, and Lizzie Shew, his wife, was about seventy-two years of age. They had lived for many years on a farm near the town of Cheney, Sedgwick county, Kansas.

"3. A. L. Shew had had a severe sickness and an operation several years before the making of the will, and while he was sick and incapacitated from doing any labor on the farm, his wife and the plaintiff in this case, Nora Warwick, did the necessary work on the farm.

"4. A. L. Shew was subject to sinking spells, and, shortly before his death, suffered from cerebral softening. He was nervous, but able to get around and do light work. At the time of the making of his will he was living with his wife in the town of Cheney.

"5. About the 11th of August, 1919, a banker in the town of Cheney, named Zerkle, called Otto Souders, an attorney of Wichita, and told him that the Shews wished to make a will. Mr. Souders, who had formerly lived in the vicinity of Cheney and was well acquainted with the Shews, went to Cheney and called at the bank of Mr. Zerkle, and then went to the home of the Shews and consulted them about making the will. They informed him that they wished to make a joint will. He advised against the making of such a

will, and gave as a reason that that was apt to lead to litigation and that it might tie up their property, but they both insisted that they wanted such a will drawn.

"6. Mr. Souders then went to the bank of Mr. Zerkle, where the will was drawn.

"7. After the will was drawn up by the attorney, Mr. Otto Souders, he, accompanied by Mr. Zerkle, took it to the home of the Shews, where Mr. Shew was confined to his bed, and read it over to them. It was then signed by A. L. Shew and Lizzie Shew in the presence of each other and in the presence of Otto Souders and Wallace E. Zerkle. Both at the first conversation and at the time the will was signed the attorney fully explained to both Mr. and Mrs. Shew the will and its legal effects.

"8. Nora Warwick, the plaintiff, was not consulted in the making of the will.

"9. After the will was drawn up by the attorney, Mr. Otto Souders, he, accompanied by Mr. Zerkle, took it to the home of the Shews, where Mr. Shew was confined to his bed, and read it over to them. It was signed by A. L. Shew and Lizzie Shew, in the presence of each other and in the presence of Otto Souders and Wallace E. Zerkle.

"10. On September 27, 1919, A. L. Shew died, and his will was probated on October 31, 1919.

"11. That Lizzie Shew filed her election with the probate court to take under the will.

"12. After that and on the 2d day of March, 1922, an action was brought by Lizzie Shew to set aside the will. This action was never tried; and on January 6, 1926, Lizzie Shew, the other testator, died. The action brought by her was never revived.

"13. That Lizzie Shew owned certain real estate in her own name. This consisted of an eighty-acre farm located in Sedgwick county, Kansas.

"14. The will of Lizzie Shew was probated on the 10th day of January, 1927, and Mr. F. Zimmerman, a banker of Cheney, was appointed administrator.

"15. On the 12th day of March, 1927, this action was brought by Nora Warwick to set aside both the will of A. L. Shew and Lizzie Shew, alleging undue influence and mental incapacity of the testator, A. L. Shew, and undue influence and constraint on the testator, Lizzie Shew.

"16. The case, over the objection of the defendants, was tried to a jury, and special questions were submitted to the jury and were answered as follows:

" '1. Was the deceased, A. L. Shew, on the 11th day of August, 1919, at the time the instrument claimed to be his last will and testament purports to have been made, of such sound mind and memory to enable him to know and understand the business in which he was engaged and the disposition and manner in which he was willing and disposing of his property? A. No.

" '2. Was the said instrument made and signed by the said A. L. Shew by reason of undue influence brought to bear upon him at the time of the signing of the same? A. No.

" '3. If you answer the foregoing question in the affirmative, state of what that influence consisted. A. ———.

" '4. Was there any undue influence or constraint brought to bear

upon the deceased, Lizzie Shew, at the time she signed the same, on August 11, 1919? A. Yes.

" '5. If you answer the foregoing question in the affirmative, state of what that influence consisted. A. Undue influence caused through fear for A. L. Shew's peace of mind and body.

" 'Nov. 18, 1927. (Signed) H. O. SOUTHWELL, *Foreman.'*

"17. The court adopts the findings made by the jury.

"18. The court further finds that none of the officers, agents or representatives of either of the defendants, the Wesley Hospital and Nurses' Training School Association and the Kansas Children's Home Finding Society, now the Kansas Children's Home and Service League, nor anyone representing them, ever made any representations of any kind or ever exercised undue influence of any kind over A. L. Shew.

"19. The court further finds that none of the officers, agents or representatives of either of the defendants, the Wesley Hospital and Nurses' Training School Association and the Kansas Children's Home Finding Society, now the Kansas Children's Home and Service League, nor anyone representing them ever made any representations of any kind or ever exercised undue. influence of any kind over Lizzie Shew.

"20. The court further finds that the eighty acres of land, being the farm near Cheney, is the only property of either Lizzie Shew or A. L. Shew, that was not willed to members of the family in said joint will.

"21. The court further finds that said will is a joint, mutual and reciprocal will, was executed by the parties at the same time, and disposed of all the property belonging to either and both of the said testators, and that its provisions are mutual and reciprocal.

"CONCLUSIONS OF LAW.

"From the foregoing, the court concludes that this action, having been brought more than one year after the probate of the will of A. L. Shew, that it was brought too late, and that his will should stand so far as it affects his own property, and that the will of Mrs. Lizzie Shew, having been executed because of undue influence through fear for A. L. Shew's peace of mind and body, should be set aside as to her own property, and that the property of Lizzie Shew should descend according to law."

The first question is at least partially disposed of by the last finding of the trial court, to the effect that the will was a joint, mutual and reciprocal one. This may be more of a question of law than of fact. Appellants concur with the court in this finding, while appellee insists that it is neither mutual nor reciprocal, without controverting the claim of appellants that it cannot be set aside after the death of the testators if it is mutual and reciprocal. Appellee relies wholly upon the decision in the case of *Menke v. Duwe et al.,* 117 Kan. 207, 230 Pac. 1065, to show that the will here in question was not mutual and reciprocal. Justice Burch, in reviewing in that case the cases and authorities determining whether or not a will is mutual and

reciprocal, bases the distinction upon the fact of its being contractual or not, holding that the document itself in that case, as well as the extrinsic evidence, showed the nonexistence of a contract between the devisors. That document contained the following sentence: "This will was executed after all matters were thoroughly considered, and disposal of all property is herein made exactly as desired." Immediately following the quotation the court said:

"Since care was taken to insert this paragraph in the will, it is fair to assume it tells the whole story. There was thorough consideration and exact expression of intention, but nothing more. If the instrument was the result of contract, under which the making of each will was consideration for making the other, that paragraph was the place in which to state the fact, and there is no such statement. The result is, the instrument itself, although declared to be 'our last will and testament,' although containing reciprocal testamentary dispositions, and although jointly executed, does not compel the inference that it was contractual in character." (p. 220.)

Because of the lack of any contractual relationship, the widow, one of the testators, prevailed and the will was set aside.

In the case at bar we have in the will itself a plain and positive contract, the violation of which would be a breach of contract justifying relief in a court of equity. The first paragraph of the joint will is as follows:

"We, A. L. Shew and Lizzie Shew, husband and wife, of Cheney, Kansas, both being of sound mind and disposing memory and desiring to make disposition of our earthly affairs so that no contention may arise concerning the same when we or either of us be dead, do each mutually in consideration of the other making his will, and of the provisions made herein in each other's behalf, make this our last will and testament and agree that the same cannot be changed or varied by either without the consent in writing of the other."

We have no hesitancy in concluding, as did the trial court, that this will is contractual in nature and is mutual and reciprocal both in fact and in law.

"Mutual or reciprocal wills are those in which two or more persons make mutual or reciprocal provisions in favor of each other, as by providing that the property of one dying first shall go to the survivor or survivors; and this may be either where all of them unite in the execution of one instrument, or where several instruments are executed by each of them separately." (40 Cyc. 2110.)

"If the wills recite that they were made pursuant to an agreement, such statements are accepted as evidence of the fact." (1 Alexander's Commentaries on Wills, § 91.)

The decisions are uniform to the effect that a mutual and recip-

rocal will cannot be set aside after the death of one of the testators, especially if the survivor recognizes it as such or accepts any benefits under it.

"A mutual and reciprocal joint will, made by a husband and his wife, cannot, after the death of the wife and the acceptance of benefits under the will by the husband, be revoked by his subsequent marriage." (*Lewis v. Lewis,* 104 Kan. 269, syl. ¶ 2, 178 Pac. 421. See, also, *Campbell v. Dunkelberger,* 172 Ia. 385; *Frazier v. Patterson,* 243 Ill. 80; *Baker v. Syfritt,* 147 Ia. 49.)

"Even in equity a joint and mutual will may of course be revoked by the consent of both parties in their lifetime, and it may be revoked separately providing the party intending to revoke gives notice to the other of such revocation." (40 Cyc. 2119. See, also, 30 A. & E. Encyc. of L., 2d ed., 621.)

The record in this case shows the wife filed her election to accept under the terms of the will of her husband, which election was never revoked, and she accepted the benefits accruing to her under the will. It is strongly contended by appellee that the election to take under the will should not have any weight in this case because there is evidence to show that her rights under the law were not fully explained to her and she did not fairly understand her rights and privileges; but she made no effort to revoke such election in the six years she survived her husband, except to file suit to set aside the will nearly four years prior to her death, which never came to trial during her life, and the case was never revived after her death. The two strong cases cited indicate that the widow might have revoked her election if she did not understand her rights at the time she made it, but they have no application to a case where she made no attempt to revoke the election except indirectly by simply filing a suit to set aside the will. In line with the authorities above cited we maintain that a mutual and reciprocal will cannot be set aside by either testator after the death of the other, especially if the survivor recognizes it as such and accepts any benefits thereunder. And of course no greater rights accrue to a descendant or heir than to the surviving testator.

The second question in the case is whether the mother executed the will by reason of undue influence. The jury and the court found that she did and that the undue influence consisted of fear for her husband's peace of mind and body. The evidence and findings show that he was very old, was nervous, and had sinking spells, and it is said the wife feared if she did not sign the will and he became excited or nervous over it he might have another sinking spell and not

survive it, and on that account she was willing to sign anything to avoid such a serious result. The appellants strenuously objected to all such testimony as being hearsay and incompetent, and now insist that it should not be considered. Without at this time expressing an opinion on the question of its competency, let us consider whether such fear constitutes undue influence.

Appellee, in support of her theory, cites three Kansas cases: *Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634; *Weisner v. Weisner*, 89 Kan. 352, 131 Pac. 608; and *Menke v. Duwe*, 117 Kan. 207, 230 Pac. 1065. The last two concern consent of the wife to her husband devising more than half of his property to others, and they throw very little light upon the question of undue influence. Both involve the will of the husband as to his own property—quite different from the facts in the case at bar. The first case above referred to by appellee, the Ginter case, is very much in point. Paragraph one of the syllabus gives us a good definition of the undue influence required to set a will aside. It is as follows:

"To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own."

Further, in the second paragraph, it was said:

"Although in strictness fraud and undue influence are distinguishable, more often than otherwise it is a mere matter of a choice of terms. Always something sinister is involved which perverts the testator's will by overcoming his power truly to express his real desires."

This was a case of discrimination by the father in his will between two sons, one of whom had been indulgent and kind, while the other quarrelsome and inconsiderate of his father's feelings. The court in the opinion said:

"It is not improper to advise, to persuade, to solicit, to importune, to entreat and to implore. Hopes and fears and even prejudices may be moved. Appeals may be made to vanity and to pride; to the sense of justice and to the obligations of duty; to ties of friendship, of affection and of kindred; to the sentiment of gratitude; to pity for distress and destitution. It is not enough that the testator's convictions be brought into harmony with that of another by such means. His views may be radically changed, but so long as he is not overborne and rendered incapable of acting finally upon his own motives, so long as he remains a free agent, his choice of a course is his own choice, and the will is his will and not that of another." (p. 726.)

We are unable to find in the record of facts and findings in our

case that sinister element which is said to be always involved. The influence of affection and anxiety for the health and peace of mind and body is natural, commendable and legitimate. Any influence, however exerted, is not undue or wrongful so long as it does not extend to positive dictation or control. (*Smith v. Boswell*, 93 Ark. 66.)

"Lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness." (2 Alexander's Commentaries on Wills, § 588.)

The facts in the case of *Henderson v. Jackson*, 128 Ia. 326, are more nearly like those in the instant case than any to which our attention has been directed or that we have found. There the wife had promised her husband on his deathbed, much against her own wishes and desires, to devise all of their property by will to his relatives to the exclusion of her own relatives. Four years after his death, through fear to do otherwise and because of her promise to him and his urgent insistence on his deathbed, she devised everything to his relatives. It was said in that case that an act prompted or controlled by a moral conviction of the binding obligation of a promise is not an act induced by undue influence. A person who feels compelled to do a thing because it is right may be altogether mistaken as to the moral quality of the act, but the freedom of will is not impaired in the slightest degree. The husband in that case as in this was the one exerting the influence, and the wife in both cases, not by being coerced or controlled but by yielding to his wishes—in that case because of a promise made and in this because of fear of his peace of mind and body—exercised her own free agency and voluntary judgment, assigning and giving a reason. Where the will is executed by the freedom of will, the voluntary act, and the exercise of reason and free agency, there is no undue influence, for the influence, to be undue, unless it goes further than to solicit, induce and persuade, must operate to destroy the freedom of power to exercise one's own judgment under the existing circumstances.

"To come within the ban of the law, the request and importunity of the husband must have gone to the point where argument and persuasion end and coercion, either physical or moral, begins, and the act of the testatrix must not have been a voluntary yielding to the request or demand of her husband, but a submission of her mind and will to his." (*Henderson v. Jackson, supra*, p. 332.)

There is no exercise of reason under unlawful coercion or control. Again, they were in this case alike interested in these worthy objects of charity supervised by the church to which they both belonged and to which they were equally devoted. The idea of a sinister motive and craftiness on the part of the dying husband to effect these benevolent devises is inconceivable. The almost universal inclination to do something of this kind is natural. It was not unnatural in this case, because all the balance of the possessions of this husband and wife went to their relatives. The argument would have had more force had they devised to charity and benevolences everything they had to the exclusion of their own daughter.

We conclude that the document in question was a joint, mutual and reciprocal will and cannot be set aside after the death of either of the makers, and that influence caused through fear for peace of mind and body is not undue influence and such as is necessary to invalidate the making of a will.

The judgment is reversed and the cause remanded with instructions to render judgment for appellants in accordance with the opinion herein expressed.