No. 47,578

Katherine S. Reznik and William H. Seed, Jr., *Appellees*, v. Mabel H. McKee, Trustee, and Jay Fred Kubik, Trustee, and Charitable Foundation, Inc., *Appellants*.

(534 P. 2d 243)

Opinion filed April 5, 1975.

*William Tinker,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, argued the cause, and *Larry D. Shoaf,* of the same firm, was with him on the brief for the appellants.

*Donald R. Newkirk,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *Thomas D. Kitch,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from a judgment of the district court of Sedgwick County, Kansas, finding that *inter vivos* reciprocal trusts created by H. W. Cardwell and Katherine Cardwell were contractual in nature, and enforcing the provisions of the trust created by H. W. Cardwell for the benefit of the plaintiffs (appellees herein) against his estate, which is being administered by the defendant trustees (appellants herein) in accordance with the provisions of the H. W. Cardwell Revocable Trust as amended. The trial court found H. W. Cardwell had breached an agreement with his wife by failing to leave certain property for the plaintiffs (who are two of his grandchildren) in trust upon his death. The trial court ordered reinstatement of the written trust provisions creating such benefits, which had been revoked by H. W. Cardwell prior to his death.

The underlying question is whether the provisions made for the benefits of the plaintiffs in the H. W. Cardwell Revocable Trust as amended January 17, 1962, later cancelled by an amendment to that trust dated May 31, 1965, after the death of Katherine Cardwell,

were made pursuant to an agreement or contract, which can be enforced as a claim against the estate of H. W. Cardwell, deceased.

The evidence presented to the trial court consisted of the trust documents and various amendments thereto, the charter of Charitable Foundation, Inc., the pleadings, interrogatories and answers filed by both parties. A summary of the pertinent provisions contained in the seven trust documents involved in this litigation is essential.

In August of 1960 H. W. Cardwell, and his wife, Katherine S. Cardwell, resided in Wichita, Kansas. They had two children, H. W., Jr., and Jean Anne, who were married adults and each had two children, so that Mr. and Mrs. Cardwell had an immediate family of two children and four grandchildren. The Cardwells were wealthy people possessing a combined estate in excess of $4,000,000 at that time.

On August 12, 1960, Mr. and Mrs. Cardwell executed separate instruments denominated the "Katherine S. Cardwell Revocable Trust" and the "H. W. Cardwell Revocable Trust." Their entire combined estate was settled in these two trusts. The preamble in Mr. Cardwell's trust recites that he is "joined herein by my wife, Katherine S. Cardwell" and that he is delivering all of his property, both real and personal, to himself and to Mable H. McKee (one of the appellants herein) as co-trustees. In the same manner, the preamble in Mrs. Cardwell's trust recites that she is "joined herein by my husband, H. W. Cardwell" and that she is delivering all of her property, both real and personal, to H. W. Cardwell as trustee.

Each settlor was joined in the execution of his or her trust by the other spouse who expressly consented to the terms and provisions of the instrument and waived all rights as the settlor's spouse in and to the trust property under law.

Each trust directs the trustees to distribute all income from the trust property to the settlor during his or her lifetime "at such intervals and in such amounts as the settlor may from time to time direct." The same provision also authorizes the settlor "to withdraw from time to time, and at any time, any part of the Trust Estate." Each settlor reserved the right to alter, amend or revoke in whole or in part, his or her trust by delivering a written instrument to the trustees then serving.

Article II of each trust makes provision for the disposition of specific personal property upon the death of the settlor. Certain personal property (jewelry and clothing) is to be distributed out-

right upon the settlor's death and other specified personal property (automobiles, household property and stock) is to be held or used by the surviving spouse for life with the remainder over to other named beneficiaries.

In the last paragraph in Article II, paragraph 2.7, of each instrument the settlor explains the omission of certain heirs. Mr. Cardwell's trust recites:

"Settlor makes no provisions for distributions for the primary benefit of Settlor's children for the reason that he has previously made provisions for them by gifts of stock and otherwise, and *also for the reason that Settlor's wife has made ample provision for such children.*" (Emphasis added.)

Mrs. Cardwell's trust recites:

"Settlor make no provision for the distributions for the primary benefit of Settlor's grandchildren *for the reason that Settlor's husband has made ample provision for such grandchildren.*" (Emphasis added.)

The property disposed of by specific legacy under Article II of each trust was relatively insignificant. The great bulk of each estate consisted of shares of stock in the Cardwell Investment Company. Article III of each trust provides for the disposition of this stock and all remaining property held by the respective settlors at death.

Article III of Mrs. Cardwell's trust places her entire residuary estate in trust for the benefit of their son and daughter, each of whom is given a power of appointment over the estate remaining at his or her death. If the son and daughter predecease the settlor then the residuary estate is given to their issue.

Article III of Mr. Cardwell's trust consists of a single paragraph which divides the estate remaining after the dispositions made in Article II into two parts of equal value, one of which is to be "held in trust, managed, invested and distributed for the benefit of the issue of Settlor's son" and the other of which is to be likewise held and managed in trust "for the benefit of the issue of Settlor's daughter."

Article V of the H. W. Cardwell Revocable Trust directs that, after the settlor's death, cash payments be made to his wife (for "medical and hospital expenses and maintenance" during her lifetime), his sister ($3,000 per year for life) and five other individuals (a maximum of $140,000 is to be paid over a period of ten years). These payments are to be made in equal shares from the income of the trusts created for the benefit of his grandchildren. No similar provision appears in Mrs. Cardwell's trust.

The remaining provisions in both trusts deal with the powers, duties, obligation, authority, accounting and succession of the trustees. These provisions are substantially identical. Each trust provides for alternative dispositions in the event any of the beneficiaries (including each spouse, the children and the grandchildren) do not survive the settlor and for final disposition of the trust property upon the death of the beneficiaries who do survive the settlor.

On the same day that the Cardwells' Revocable Trusts were executed (August 12, 1960), a third instrument denominated "H. W. Cardwell Irrevocable Trusts" was executed by both parties. The preamble recites that H. W. Cardwell is "joined herein by my wife, Katherine S. Cardwell" in the delivery and transfer of $500,000 to the trustees to be held in separate and equal trusts for the benefit of their four grandchildren, of whom the plaintiffs in this suit are two. Mrs. Cardwell executed the trust reciting that she "does hereby consent to each and all of the terms and provisions of the foregoing instrument, waiving any and all rights that she had or might have as the wife of Settlor in or to said property under law."

The H. W. Cardwell Irrevocable Trusts are not in dispute in this litigation. The instrument creating them does, however, in the preamble, express concern that the grandchildren "will be afforded little opportunity to develop a sense of responsibility and independence in financial matters" due to the financial assistance previously provided to them by Mr. Cardwell "during their tender years" and that, if such financial assistance continues, they "will have little opportunity to gain experience in the handling of money and property." The preamble then states that it is "imperative that [the grandchildren] be capable of handling their own funds and properties before they inherit or otherwise acquire substantial properties which they must manage." Article II of the irrevocable trust instrument directs that distributions of income from the irrevocable trusts to the grandchildren are to be made by the trustees for the purpose of providing them with a "fund for investment and management" which can be suspended if they "should demonstrate a lack of responsibility and good judgment in the handling of the funds so distributed."

Following the execution of her revocable trust, Mrs. Cardwell amended her declaration of trust on December 23, 1960, pursuant to the right reserved to alter, amend, or revoke the trust. Mr. Cardwell acknowledged the amendment and consented to it in writing.

The substance of the amendment is not pertinent to the case at bar, but the amendment recited in Article IV: "The right to alter, amend, or revoke, in whole or in part, the foregoing Amendment is hereby reserved to Settlor."

Thereafter on January 17, 1962, Mr. Cardwell executed an amendment to his 1960 revocable trust. The amendment stating:

"Pursuant to the right reserved to me as Settlor of the H. W. Cardwell Revocable Trust to alter, amend or revoke said trust, I . . . joined herein by wife, KATHERINE S. CARDWELL, do hereby amend said transfer and declaration of trust. . . ."

For the most part, the amendments made technical changes and minor adjustments which are not at issue here. In the closing paragraph Mrs. Cardwell declares she "does hereby consent to each and all of the terms and provisions of the foregoing instrument, waiving any and all rights that she has or might have as the wife of Settlor in or to said property under law." The same recitation is made in paragraph 2.7, as in the previous trust, that:

"Settlor makes no provision for distributions for the primary benefit of Settlor's children for the reason that he has previously made provision for them by gifts of stock and otherwise, and also for the reason that Settlor's wife has made ample provision for such children."

Article III of Mr. Cardwell's 1962 amendment replaced the single paragraph contained in Article III of the 1960 trust with eight new paragraphs. Under the 1962 amendment shares of Cardwell Investment Company stock having a total value of $500,000, but not in excess of 3,125 shares, were to be placed in trust for Mr. Cardwell's grandchildren. The amendment further required the trustees to distribute to Charitable Foundation, Inc., (a non-profit, tax exempt corporation organized under Kansas law by Mr. Cardwell) $571,000 worth of Class A common stock of Cardwell Investment Company (reduced by the total amount of shares previously transferred and prior contributions). It is then directed that the remaining shares of Cardwell Investment Company be placed in a new trust which was to be administered for the benefit of Mrs. Cardwell and certain other named income beneficiaries who survive the settlor. Upon the death or payment in full of these beneficiaries, any remaining assets are to be "held for the benefit of all those persons, other than Settlor, who have at any time served as Trustee." All trusts created under Article III, as amended, are to terminate 21 years after the death of the survivor of the issue of

Mr. and Mrs. Cardwell or upon the liquidation of Cardwell Investment Company.

The trial court found that based on the evidence contained in the answers to interrogatories the 1962 amendment amounted to a substantital reduction in the property Mr. Cardwell was providing for the grandchildren.

The 1962 amendment of Mr. Cardwell in Article XIII recites:

"Settlor reserves the right to alter, amend or revoke, in whole or in part, this trust instrument and all trusts created pursuant hereto. Such power to alter, amend or revoke may be exercised by written instrument signed by Settlor and delivered to Trustees then serving, provided, however, that no such alteration or amendment shall increase the duties and responsibilities of the Trustee unless Trustee consents to such alteration or amendment in writing or by endorsement thereon. Amendments may be cancelled or amended in like manner."

Further amendments which were made to Mr. Cardwell's revocable trust on May 21, 1964, did not affect the trusts created for the benefit of the grandchildren. As in the case of the 1960 revocable trust of Mr. Cardwell and the 1962 amendment thereto, the 1964 amendment recites that the settlor is "joined herein by my wife" and the instrument itself is executed by both Mr. and Mrs. Cardwell. The 1964 amendment recites that it was:

"Pursuant to the right reserved to me as Settlor of the H. W. Cardwell Revocable Trust to alter, amend, or revoke. . . ."

The 1964 amendment again said:

"The right to alter, amend or revoke in whole or in part the foregoing amendment is hereby reserved to Settlor."

Mrs. Cardwell died on July 15, 1964. Her estate was distributed according to the provisions of her revocable trust of August 12, 1960, and its amendment of December 23, 1962. After the payment of estate and inheritance taxes, her trust estate had a value of $987,000. The income from this estate is currently being distributed to her two children.

Mr. Cardwell amended his trust for the last time on May 21, 1965. Article II of the 1965 amendment directs the trustees to distribute any automobile or automobiles to the settlor's son (H. W. Cardwell, Jr.); distribute tangible personal property of personal use and adornment, household property and stock to the settlor's daughter (Jean Anne Cardwell Nicoli). The trustees are also to forgive the unpaid balance of a promissory note executed by the settlor's daughter. The final paragraph in Article II states:

"Settlor makes no further provisions for distributions for the primary benefit of Settlor's daughter for the reason that he has previously made provision for her by gifts of stock and otherwise, and also for the reason that Settlor's wife has made ample provision for such daughter."

The remaining portion of the trust estate is distributed under Article III as follows: A trust was established for the settlor's son for the purpose of equalizing the number of shares of Cardwell Investment Company, Inc., stock the son would receive with the number the daughter received pursuant to the provisions of Katherine Cardwell's trust; a total of $250,000 worth of stock was placed in separate trusts for the benefit of three named individuals; from the remaining assets periodic cash payments in excess of $300,000 are to be made to eight individuals; and all funds remaining in the trust estate and all reversionary interests in any funds not completely disposed of by the foregoing provisions are given to Charitable Foundation, Inc.

*The 1965 amendment to the H. W. Cardwell Revocable Trust left the grandchildren of H. W. Cardwell without any share whatever in the primary benefits* provided by the estates of Mr. and Mrs. Cardwell. Since Mrs. Cardwell died ten months earlier, she was no longer able to amend her trust to provide for her grandchildren.

In the 1965 amendment to his trust Mr. Cardwell recited:

"Pursuant to the right reserved to me as Settlor of the H. W. Cardwell Revocable Trust to alter, amend or revoke said trust, I, H. W. Cardwell of Sedgwick County, Kansas, hereinafter called 'Settlor,' do hereby amend said transfer and declaration of trust, and the H. W. Cardwell Revocable Trust created thereby, by substituting the provisions which are set out below for all of the provisions contained in said transfer and declaration of trust executed the 12th day of August, 1960, and contained in the amendments heretofore made to such transfer and declaration of trust and to the trusts created thereby. . . ."

Using the same language contained in his original revocable trust instrument he reserved the right to alter, amend and revoke.

H. W. Cardwell died on January 18, 1972, without making any further amendments to the trust. As of the date of the execution of the 1965 amendment to his trust the estate of H. W. Cardwell had an approximate value of $2,229,000. After his death and the payment of debts, funeral expenses, state and federal taxes the net value of the H. W. Cardwell Revocable Trust was $2,160,000.

Thereafter the trustees proposed to distribute the trust according to the provisions of the 1965 amendment, which would not include any benefits for the grandchildren. The trustees proposed

distribution would include $1,325,633 to Charitable Foundation, Inc.

Charitable Foundation, Inc., is a non-profit, tax exempt corporation which was organized under Kansas law by H. W. Cardwell prior to his death in 1961.

The corpus of the H. W. Cardwell Trust had a value of approximately $2,342,000 when the January 17, 1962, amendment was executed by Mr. and Mrs. Cardwell, limiting the interest of their grandchildren therein to $500,000 worth of Cardwell Investment Company stock. As the children of the daughter of Mr. and Mrs. Cardwell, the plaintiffs sought and obtained enforcement in the trial court of the trust created for their benefit in 1962 consisting of $250,000 worth of Cardwell Investment Company stock ($125,-000 each). The other two grandchildren have not brought suit and are not parties to the case.

The appellees filed this action alleging that:

". . . [T]he provision for the benefit of these plaintiffs were made pursuant to contract, were joint, mutual and reciprocal and the amendment or revocation thereof by the unilateral act of H. W. Cardwell after the death of Katherine S. Cardwell was invalid and of no force and effect. By reason thereof, these plaintiffs are entitled to the benefit provided them by the provisions of Article III, Paragraph 3.2 of the H. W. Cardwell Revocable Trust Amendment of 1962 and which right constitutes a claim against the estate of H. W. Cardwell, deceased, which defendants are obligated to recognize and pay as provided by Article II, Paragraph 2.2 of the H. W. Cardwell Revocable Trust Amendment of 1965. . . ."

Charitable Foundation, Inc., was named as a defendant below in addition to the trustees because under the 1965 amendment claims asserted against the estate of H. W. Cardwell are to be paid first from the funds and properties which would otherwise be distributed to Charitable Foundation, Inc.

The appellants' answer denied the Cardwells had any agreement to provide for the disposition of their respective estates, or that Mrs. Cardwell relied upon any disposition of property made by her husband's trust; asserted that Article II, § 2.7 of Mrs. Cardwell's trust instrument referred to gifts, provision and arrangements for the grandchildren extrinsic of any terms of Mr. Cardwell's revocable trust; and further stated that Mr. and Mrs. Cardwell expressly reserved and recognized the right and power of each to alter, amend and revoke in whole or in part, their trusts.

The suit was tried as a non-jury case. The trust instruments of

the H. W. Cardwell and Katherine S. Cardwell Revocable Trusts, and all amendments to both, the H. W. Cardwell Irrevocable Trust, and other documents listed in the Pretrial Conference Order were introduced as evidence, together with interrogatories and answers. No oral testimony was introduced, or evidence extrinsic to the documents themselves. The parties stipulated as to the family relationships, dates of death of Mr. and Mrs. Cardwell, execution of the documents and other basic facts heretofore recited.

After considering the Cardwells' revocable trusts and the various amendments thereto, Mr. Cardwell's irrevocable trust, the pleadings and interrogatories the trial court made the following findings of fact:

"17

"After considering all of the evidence this Court is compelled to find that the provision made by Mr. Cardwell in his revocable trust of August 12, 1960, for the benefit of the plaintiffs herein, as amended in January of 1962, was made pursuant to agreement with Mrs. Cardwell. It is impossible for this Court to believe that a man and wife with children and grandchildren, could on the same day execute separate instruments, testamentary in nature, wherein the husband excluded the children of the parties, and the wife excluded the grandchildren of the parties, and each explained this exclusion by a recital that the other had made ample provision for the excluded class, in the absence of an agreement arrived at between themselves to do just that.

18

"The stated purpose of Mr. Cardwell's irrevocable trust of the same date, August 12, 1960, and Mrs. Cardwell's consent to and execution thereof, clearly demonstrates that both Mr. and Mrs. Cardwell contemplated on August 12, 1960, that their grandchildren would eventually inherit or receive substantial properties and/or moneys to manage and invest. In fact, Mr. Cardwell did originally provide that the bulk of his estate would go to the grandchildren, but did later reduce this by the January 1962 amendment to a specified $500,000, with the consent of Mrs. Cardwell. There can be no question but that this amendment made to the provision for the grandchildren was the result of further agreement between Mr. and Mrs. Cardwell.

19.

"Mrs. Cardwell lived almost four years after the execution of her revocable trust. She refrained from making any modifications of her trust to include her grandchildren. She was fully aware of the provisions contained in Mr. Cardwell's revocable trust for the benefit of their grandchildren, and in fact had consented to a reduction of same in January of 1962. The recital in her trust instrument explaining her exclusion of her grandchildren demonstrates that it was not her intent that they be cut off, but rather that she was omitting them in her trust in reliance on the provision being made for their benefit

in Mr. Cardwell's trust; and at all times from the execution of these revocable trust instruments by Mr. and Mrs. Cardwell, up to and including the time of Mrs. Cardwell's death, Mr. Cardwell had in truth and fact made provision for the grandchildren of the parties in his revocable trust, and excluded his children, and Mrs. Cardwell had made provision for the children in her revocable trust, and excluded the grandchildren.

20

"Neither Mr. or Mrs. Cardwell's revocable trust, nor any amendments thereto were ambiguous, and said instruments show on their face by the terms and provisions thereof that they are contractual in character.

21

"Mr. Cardwell breached the agreement between himself and Mrs. Cardwell relating to disposition of their collective estate as it applied to their grandchildren when he unilaterally amended his revocable trust less than a year after the death of Mrs. Cardwell in May of 1965, and eliminated therefrom all direct benefits to the grandchildren."

The trial court concluded that the prior decisions of this court enforcing contractual wills (*In re Estate of Miller*, 186 Kan. 87, 348 P. 2d 1033; and *In re Estate of Chronister*, 203 Kan. 366, 454 P. 2d 438) are applicable to reciprocal, *inter vivos* trusts that are testamentary in character; that the reservation by Mr. and Mrs. Cardwell of the right to amend, alter or revoke any part of the trust agreement "cannot be interpreted to mean that part of the contract between the parties was that either of them could breach it at will"; therefore, judgment was entered directing the trustees to establish from the assets of Mr. Cardwell's trust estate a trust for each appellee in the principal amount of $125,000 to be administered in accordance with the provisions contained in the January 17, 1962, amendment to Mr. Cardwell's revocable trust.

The trial court also awarded $40,000 for the appellees' attorneys and the appellants' attorneys as reasonable attorneys' fees. The trial court considered as factors in determining the allowance of reasonable attorneys' fees the amount, nature, and character of the services rendered, the skill and experience required to perform such services, time and effort expended, the amount of money or value of property involved, the results or benefits obtained from the services performed, and the professional character and standing of the attorneys. (See, *Wollard v. Peterson*, 145 Kan. 631, 66 P. 2d 375; and *Wolf v. Mutual Benefit Health & Accident Association*, 188 Kan. 694, 366 P. 2d 219.)

The appellants have duly perfected this appeal from the trial

court's findings of fact, conclusions of law and the order of allowance of attorneys' fees.

Counsel for the appellants argue in their brief:

". . . We feel, however, that the law relating to contractual wills is directly applicable to the case at hand, for this case, as with the contractual will cases, involves an alleged contract relating to property succession. Moreover, Mr. and Mrs. Cardwell's revocable trusts, making disposition of the major portion of their estates, were effectively used as will substitutes.

"The parties to this dispute are in agreement that the law relating to contractual wills, if not controlling, is analogous. In substantial part, this position is born of necessity. An exhaustive search by counsel for the trustees, including the comprehensive treatises by Professors Scott and Bogert (specifically, those sections pertaining to revocable trusts and to constructive trusts), has produced no cases involving trusts that bear even tangentially on the matter in dispute.

"The trustees feel that this circumstance is not accidental. Stripped to its essentials, the contention made by the plaintiffs is rather remarkable. They contend that a trust instrument which by its terms provided that 'Settlor reserves the right to alter, amend or revoke, in whole or in part, this trust instrument and all trusts created pursuant hereto,' and which was amended by the Settlor on two occasions 'Pursuant to the right reserved to me as Settlor,' (1) Was not amendable without the consent of the Settlor's wife during her lifetime, and (2) was not amendable by the Settlor at all (with respect to dispositions to the grandchildren) after his wife's death. In other words, the plaintiffs contend that the explicit language of the trust instrument, known to and understood by both the Settlor and his wife (who joined in the execution of the trust) is not controlling; rather, that the couple agreed—contractually agreed—that upon the death of one spouse the survivor would not revoke or modify his trust as it pertained to the couple's grandchildren."

Our decisions concerned with whether or not joint or reciprocal wills were contractual in character are numerous. (In re Estate of Chronister, supra; In re Estate of Thompson, 206 Kan. 288, 478 P. 2d 174; and the cases cited therein.) It was recognized long ago that a single instrument may be both a will contractual in nature, and a contract testamentary in nature; as a will it is revocable but as a contract it is enforceable; and although a contractual will revoked by execution of a second will, cannot be probated, it may nonetheless be enforced as a contract against the estate of the testator breaching it (Menke v. Duwe et al., 117 Kan. 207, 216, 230 Pac. 1065). This is true not only when the will is joint in form and contained in a single common instrument, but also when it is drawn in the form of a separate document. (In re Estate of Chronister, supra.)

The existence or nonexistence of an agreement or contract is in

its very nature a fact. If a joint and mutual will is the result of a contract, under which the making of each will is consideration for making the other, it is necessary to establish that fact by direct or circumstantial evidence. Furthermore, it is essential to the validity and enforcement of a contract for the execution of wills containing bequests and devises, which are reciprocal between the parties, that the contract be definite, certain and unequivocal as to the parties, the subject matter and the considerations. (*In re Estate of Miller,* supra.) To establish an agreement for mutual wills there must be full and satisfactory proof of the agreement, which cannot be supplied by presumption. (*Menke v. Duwe et al.,* supra.)

In *Lewis v. Lewis,* 104 Kan. 269, 178 Pac. 421, a will which had been executed jointly by a husband and wife was held by this court to be contractual on its face. In response to a contention that there was no evidence to establish that the testators had entered into any contract to make a will, the court replied:

". . . How could such a will be voluntarily executed if there was no agreement or understanding that it would be made? The will itself, its terms, and its execution, are evidence that such a contract was made. . . ." (p. 273.)

*Lewis* has been interpreted as holding that:

". . . [W]here a joint and mutual will is executed by a husband and wife *the will itself and its terms* may be taken into consideration as *circumstantial evidence* upon which to base a finding that the will is contractual. This is not to say that the execution of a joint and mutual will compels such an inference." (*In re Estate of Miller,* supra, p. 97.)

Mr. Justice Fontron, speaking for the court in *In re Estate of Chronister,* supra, succinctly summarized the following rules from our prior decisions in which wills were claimed to be contractual:

". . . (1) Whether a will is contractual, be it a joint will or one of separate wills, is a question of fact which must be established by proof. (2) The mere fact that a will is joint does not in and of itself establish it to be the result of a pre-existing agreement. (3) A joint and mutual will and the terms and provisions thereof, may be considered sufficient as circumstantial evidence to establish that it was executed pursuant to an agreement. (4) Where a joint will shows *on its face* by the terms and provisions thereof that it is contractual in character, extrinsic evidence is not admissible for the purpose of proving otherwise. (5) Where there is ambiguity from the language used in a joint will as to whether or not it is based on a contract, extrinsic evidence is admissible to establish either the existence or nonexistence of a contract." (p. 372.)

In the case at bar we are confronted with the Cardwells' separate, revocable trust declarations (with the various amendments thereto)

and Mr. Cardwell's irrevocable trust which was executed (with Mrs. Cardwell's consent) the same day the revocable trusts. These documents taken together constitute the Cardwells' total estate plan. If the Cardwells made a contract, this court must find in these documents the necessary elements of that contract.

While the trial court found the revocable trusts to be contractual, this court's scope of review is not limited to determining whether or not the trial court's finding is supported by the evidence. When the evidence from which the trial court's finding was made is wholly written and documentary in form, the reviewing court must decide for itself what the facts establish, substantially as it would if the case was originally in this court, for the trial court has no better opportunity to weigh the evidence than a court of review with the same evidence before it. (*In re Estate of Miller*, supra.)

For the reasons hereafter assigned it is our judgment the provisions made by H. W. Cardwell in his revocable trust of August 12, 1960, for the benefit of the appellees herein, as amended January 17, 1962, were made pursuant to a contract with his wife Katherine S. Cardwell which is enforceable as a claim against the estate of H. W. Cardwell, deceased.

The appellants attempt to state the appellees' position in the negative—that Mr. and Mrs. Cardwell contractually agreed that upon the death of one the survivor would not revoke or modify his trust as it pertained to the couple's children or grandchildren. The issue must be stated in the positive—whether the parties contractually agreed that Mr. Cardwell would make provision for the benefit of their grandchildren in exchange for Mrs. Cardwell's provision for the benefit of their children.

The general principle of contract law here applicable is that a court may ascertain the existence and terms of an agreement from a combination of written instruments and the acts of the parties in connection therewith. (*Allen v. Bowling*, 173 Kan. 485, 249, P. 2d 679.)

On the facts in this case the various trust instruments used by the parties in making disposition of the major portion of their estates, were effectively used as will substitutes, and of necessity the court must rely upon its prior decisions which establish the circumstances under which a contract can properly be found to exist from the provisions of joint and mutual wills.

Various approaches have been taken to determine whether a will

was executed pursuant to a contractual agreement. In a few instances, wills construed by this court have contained specific references to the fact that they were being executed pursuant to an agreement. (*Warwick v. Zimmerman*, 126 Kan. 619, 270 Pac. 612; *Berry v. Berry*, 168 Kan, 253, 212 P. 2d 283; and *In re Estate of Buckner*, 186 Kan. 176, 348 P. 2d 818.) Extrinsic evidence of a preexisting agreement to execute a joint will or mutual wills has also occasionally been provided. (*Menke v. Duwe, et al.*, supra; and *In re Estate of Wade*, 202 Kan. 380, 449 P. 2d 488.) But, for the most part, the only evidence available is the will or wills executed by the parties involved. The terms of the will may show an implication that its execution was the product of a preexisting agreement. The fact a will contains no reference to an agreement is not conclusive. A contract may be implied from the known circumstances under which the parties execute a joint will, such as their family relationship as reflected by the will itself, its terms and its execution, and the intention of the testators as gathered from the four corners of the instrument itself. In such a case, extrinsic evidence is not admissible for the purpose of proving otherwise. (*In re Estate of Chronister*, supra; and *In re Estate of Thompson*, supra.)

Where specific reference to a prior contract is lacking, wills have been construed as contractual on the basis of specific provisions or terms. A provision frequently considered by the court to determine whether a will is contractual is the manner in which all of the parties' remaining property will be distributed upon the death of the survivor. (*In re Estate of Chronister*, supra.)

The overall pattern of disposition of the family estate by the Cardwell trusts was simple. In general, each settlor retained a life interest with power of invasion in his or her trust. By identical reciprocal provisions each gave a life estate to the other in the same specific property and provided for the same disposition of that property on the death of the survivor.

Mr. Cardwell gave the remainder of his trust property, which was the substantial portion, to their grandchildren in trust, subject to any necessary life income for his wife and certain small, short-term life income grants to six friends or relatives. Mrs. Cardwell gave the remainder of her trust property, which was the substantial portion, to their children in trust for life with power of appointment.

Another provision to be considered in determining whether joint or mutual wills are made pursuant to a contract is whether there are "carefully drawn provisions for the disposition of any share in case

of a lapsed residuary bequest." (*In re Estate of Chronister*, supra; and *In re Estate of Tompkins*, 195 Kan. 467, 407 P. 2d 545.)

As found by the trial court, the trust instruments herein each contained detailed and explicit provisions relating to the disposition of the trust estate in the event any beneficiary should predecease the settlor.

The manner in which the trusts were executed provides further evidence that the parties were disposing of their estates pursuant to an agreement: The preamble of Mr. Cardwell's trust recited that he was "joined herein by my wife." The instrument was consented to and executed by Mrs. Cardwell. The preamble of Mrs. Cardwell's trust recited that she was "joined by my husband." The instrument was consented to and executed by Mr. Cardwell.

By obtaining the "joinder" and "consent" of his or her spouse, each settlor was gaining the assurance that distribution of his estate under the provisions contained in his or her trust would not be altered if he or she died first. This method of executing the trusts indicates the intent of each party to be bound by the provisions contained in both trusts. It is similar to the use of plural pronouns in joint wills which this court has previously found to constitute evidence of a contract. (*In re Estate of Chronister*, supra; and *In re Estate of Tompkins*, supra.)

The most persuasive consideration which indicates a preexisting agreement between Mr. and Mrs. Cardwell is the provision in each of the Cardwell's trust explaining the omission of certain heirs from the benefit of the trust estate created therein by referring to the other trust, thereby revealing the complete estate plan of the parties. Mr. Cardwell omitted distributing primary benefits to his children in the 1960 trust and in all subsequent amendments thereto; and Mrs. Cardwell omitted primary benefits for her grandchildren. Mrs. Cardwell explained the omission by stating "that Settlor's husband has made ample provisions for such grandchildren", and Mr. Cardwell explained the omission stating "that Settlor's wife has made ample provisions for such children."

We cannot believe a grandmother would disinherit her grandchildren and a father would disinherit his children, unless the parties had a prior agreement that provisions made by the other spouse for the excluded children (or grandchildren) would be binding.

A similar situation occurred in *In re Estate of Thompson*, supra, where the makers of a joint will left all of the property of the first

to die to the survivor with the explanation that "we make no provision for our children, Ray Thompson and Fern Thompson, leaving it to the survivor of us to make such provision as he or she sees fit." The court concluded:

". . . We do not presume under the attending circumstances, that a father and mother would disinherit their only children by written instrument, unless they had a prior agreement or contract with each other that the survivor would make such provisions for their benefit as he or she saw fit." (p. 292)

As a result, all of the property in the estate of the first to die (the husband) was held to pass to the survivor (the wife), even though the latter was incompetent at the time of her husband's death and subsequently died intestate.

The explanation given by the makers of the joint will in *Thompson* for what otherwise would have been the disinheritance of their children was, in and of itself, sufficient evidence of the existence of a contract.

The Cardwell trusts go one step further. An explanation of the omission of the children (or grandchildren) in one trust is given in recognition of the provisions already made for them in the other trust. Since all of the Cardwell family members are covered by the provisions contained in the two trusts, it is certain that their execution was preceded by negotiation and agreement between Mr. and Mrs. Cardwell concerning the manner in which their children and grandchildren would be treated under the estate plan as a whole. The survivor was not given the right or duty to provide for the children or grandchildren as he saw fit, because the parties had already reached agreement on what the provisions should be.

Paragraph 2.7 in the respective trusts of Mr. and Mrs. Cardwell was the only provision which served no function insofar as the creation or management of each trust was concerned. When viewed strictly as trusts, the insertion of these two paragraphs served no purpose. But, when the instruments are examined for evidence of a contract, these paragraphs can have no purpose other than to express the belief of the parties that their combined estates would be disposed of pursuant to agreement represented by the execution of their trusts.

It is of some significance that even though there were various amendments to the original trust instruments, the settled purpose of providing certain benefits for the children through Mrs. Cardwell's trust and other benefits for the grandchildren through Mr.

Cardwell's trust, remained intact at the time of Mrs. Cardwell's death in July 1964. The retention of the same basic estate plan (though the grandchildren's benefits were sharply decreased by the 1962 amendment of Mr. Cardwell) through the various amendments indicates a contractual agreement between the Cardwells. (See, *Eikmeier v. Eikmeier,* 174 Kan. 71, 254 P. 2d 236; and *St. Denis v. Johnson,* 143 Kan. 955, 57 P. 2d 70.)

The appellees attack the trial court's judgment by suggesting that Mrs. Cardwell's statement in paragraph 2.7, that her grandchildren are not to receive any primary benefits from her trust because of ample provisions made by Mr. Cardwell, refers to the "H. W. Cardwell Irrevocable Trust" rather than his revocable trust, and, since the irrevocable trust remains intact, there has not been a breach of any agreement the parties might have had. This interpretation of paragraph 2.7 is too restricted.

Portions of the preamble to the irrevocable trust which have heretofore been set out clearly demonstrate it was established for the purpose of teaching the grandchildren to manage funds before they received their inheritance. To achieve this purpose the trust instrument directed distribution of all income to the grandchildren, reciting that "such distributions are designed to provide a fund for investment and management at the direction of [each of the grandchildren]."

There is no dispute that paragraph 2.7 of Mr. Cardwell's trust referred to and relied upon the benefits created for his children in Mrs. Cardwell's revocable trust. In fact, Mr. Cardwell continued to recite his reliance upon his wife's distribution in his 1965 amendment. Therefore, it is unreasonable to construe Mrs. Cardwell's paragraph 2.7 so as to exclude Mr. Cardwell's revocable trust. Mrs. Cardwell was obviously referring to both the revocable and irrevocable trusts established by Mr. Cardwell, when she omitted the grandchildren from her trust in reliance upon the "ample provisions" made for them by her husband. The irrevocable trusts were executed in contemplation of the inheritance of "substantial properties" by the grandchildren. On August 12, 1960, when these trusts were established "substantial properties" (well over $1,000,000) were allocated to the grandchildren in the overall estate plan by Mr. Cardwell's revocable trust.

The appellants argue the evidence in this case constitutes no

more than evidence of an understanding of a common plan and is insufficient to make out a contract.

To the contrary, the evidence is sufficient to establish an agreement between Mr. and Mrs. Cardwell under the rules applicable to joint and mutual wills, which we hold to be applicable to the overall estate plan set forth in the trust documents executed by Mr. and Mrs. Cardwell. The requirements set forth in *In re Estate of Miller*, supra, are that the contract must be definite, certain and unequivocal as to the parties, the subject matter and the considerations. There is no confusion as to the parties to the agreement, and quite plainly the subject matter of the agreement is that Mrs. Cardwell was to provide in her trust for their children and Mr. Cardwell was to provide in his for their grandchildren. The mutual promises of the Cardwells were sufficient consideration to support their agreement as to the disposition of their property after death. (*In re Estate of Wade*, 202 Kan. 380, 449 P. 2d 488; and Sparks, Contracts To Make Wills [1956] p. 34.)

The appellees assert the trial court improperly construed the Cardwells' trust declarations by ignoring the plain meaning of the provisions in each trust instrument which explicitly reserved to each settlor the right to alter, amend or revoke the instrument. It is argued that the trial court's interpretation goes outside the language of the instruments "in an effort to give effect to what it conceives to have been the actual intent or motive of the settlor."

As previously discussed, we do not agree that the plain and unambiguous intention of the parties was to allow the surviving spouse to alter his or her preexisting agreement as to the mutual distribution of their estates as embodied within the trust declarations. We have come to this conclusion by employing the familiar rule of construction, that the settlor's intention as garnered from all parts of the instrument is to be given effect, and doubtful or inaccurate expressions in the instrument should not override the obvious intention of the settlor. (54 Am. Jur. Trusts § 17; see, *In re Estate of Miller*, supra.) Here all trust instruments must be construed together.

We perceive no inconsistency between the fact that the parties expressly reserved the right to alter, amend or revoke their trusts and our construction of the instruments as being contractual in nature. The right of each settlor to amend or revoke his or her

trust proves nothing about the existence or non-existence of a contract.

Under the law with respect to joint and mutual wills, it is readily apparent the power to amend or revoke is irrelevant as to whether or not a contractual relationship exists between the parties. *Wills are ambulatory and therefore may be revoked or amended at any time before the testator's death.* Despite this inherent feature of revocability, it is the general rule that joint or mutual wills which are contractual in nature prevent the surviving spouse from escaping the obligations of his or her agreement by revoking or amending the will. There is no substantial reason why the revocable trusts in the instant case should be treated differently than joint or mutual wills. The reservation of the right to alter, amend or revoke an *inter vivos* trust does not destroy the Cardwells' agreement.

K. S. A. 58-2417 provides:

"Every power, beneficial or in trust, shall be irrevocable, unless an authority to revoke it is reserved in the instrument creating the same."

The parties to this appeal agree the Cardwells used the trusts executed by them effectively as will substitutes. Because of 58-2417, *supra,* it was necessary for the Cardwells to expressly reserve the right to revoke or amend their trusts to retain the same flexibility in their estate planning which they would have had by employing the expedient of mutual wills. Each of them subsequently exercised his or her power of amendment on various occasions with the other's consent. By the same token, their reservation of the power to invade the trust corpus gave them the same right which they would have had under a will to conserve or expend their own property. After Mrs. Cardwell died, Mr. Cardwell's position was not distinguishable from a testator to a joint or mutual will, *i. e.,* he had the authority to amend his testamentary instrument, but any breach of his agreement with Mrs. Cardwell would be enforceable as a contract against Mr. Cardwell's estate. (*Menke v. Duwe, et al.,* supra.)

The real issue is whether the exercise of the power to amend or revoke either trust must be consented to by the other settlor. The fact that each settlor did consent to the amendments executed by the other between 1960 and the date of death of Mrs. Cardwell strongly indicates that this was the understanding between the parties.

Each of the three amendments executed after August 12, 1960,

and prior to Mrs. Cardwell's death on July 15, 1964, was approved by both parties. The general estate plan remained intact throughout, although the benefits to be received by the grandchildren were reduced with the consent of Mrs. Cardwell in the 1962 amendment to the H. W. Cardwell Revocable Trust. And, when this amendment was executed, Mr. Cardwell reiterated his reliance upon the provisions made by his wife in her trust for their children—something which he would not have been able to do with any confidence if he had not first obtained her consent to the reduction in benefits for the grandchildren.

Mrs. Cardwell died without revoking or reducing the provisions in her trust for the benefit of the children. Mr. Cardwell's acceptance of the estate plan became final upon the death of his wife as it pertained to the grandchildren. Even after Mr. Cardwell's 1965 amendment, he continued to rely upon the benefits for the children contained in his wife's trust by a recital in the 1965 amendment.

The foregoing course of conduct followed by Mr. and Mrs. Cardwell, after the execution of the trusts, further substantiates the existence of an estate plan made pursuant to an agreement which could not be modified without the consent of both parties.

The appellees maintain the allowance of fees for their attorneys was appropriate. They argue the construction of trust instruments and the benefit ensuing to the estate therefrom forms the basis upon which courts of equity have traditionally allowed attorney fees against trust property (citing, *Central Trust Co. v. Harris,* 152 Kan. 296, 103 P. 2d 902; *In Re Living Trust Created by Atwood,* 227 Minn. 495, 35 N. W. 2d 736 [1949]; 9 A. L. R. 2d 1181 to 1189; *Jesser v. Mayfair Hotel, Inc.,* 360 S. W. 2d 652 [Mo. 1962]).

Generally, it may be said attorney fees and expenses may not be allowed unless authorized by statute. (*In re Estate of Murdock,* 213 Kan. 837, 519 P. 2d 108; and *In re Estate of Hannah,* 215 Kan. 892, 529 P. 2d 154.)

In numerous cases this court has held that where a meritorious action is brought to construe a will, attorney fees are allowable under the provisions of K. S. A. 59-1504 (*Baldwin v. Hambleton,* 196 Kan. 353, 361, 411 P. 2d 626). In the case of *In re Estate of Reynolds,* 176 Kan. 254, 270 P. 2d 229, it was stated:

". . . Where the services of the claiming attorney have beer beneficial to the estate or are necessary for its proper consideration, fees have been allowed attorneys, but where the attorney acts for the benefit of his own client,

or for other purposes not helpful in the administration of the estate, such fees are not allowed." (p. 258.)

Where a controversy exists on a doubtful question of law involving the provisions of a will, it has been held the trial court should allow reasonable attorney fees out of the estate to the defeated as well as the successful party. (*In re Estate of Sowder,* 185 Kan. 74, 340 P. 2d 907.)

The appellees rely upon *Central Trust Co. v. Harris,* supra; and *Baldwin v. Hambleton,* supra, as authority for the allowance of fees in this case. In *Harris* the trustees of a residuary trust created by a will brought an action against the beneficiaries in the district court asking to be instructed to manage the trust in a manner described in the petition. The trustees' instructions were denied and the trial court found that it was not empowered by law to allow the beneficiaries attorney fees. On appeal it was held the trial court had the authority and a duty to fix a reasonable attorney's fee for the beneficiaries. The court first commented that it was difficult to see why the action could not be considered a suit to construe a will, since the whole proceedings required examination and consideration of the will creating the trust. However, the opinion continues as follows:

"Even should it be held that this was not a suit technically to construe a will, the same reasons that make it proper to tax an attorney fee as costs in such a case apply with equal force to this case." (p. 302.)

The instant case must be distinguished from *Harris.* The present action was brought by the appellees to enforce a contract as a claim *against* the estate of H. W. Cardwell, deceased. In *Harris* the beneficiaries, who were awarded the attorney's fees, defended in an action brought by the trustees seeking instructions from the court as to the management of the trust. Those equities which impelled the court in *Harris* to grant attorney's fees are not present in the case at bar.

The appellees' reliance upon *Baldwin* is also misplaced. There a declaratory judgment action was filed by a granddaughter of the testator claiming a vested remainder was created by the will. It was held through the granddaughter's successful efforts the language of the will was properly construed, and the testator's intention properly carried out. Consequently the district court had the authority and duty (K. S. A. 59-1504) to allow attorney fees as costs of the action. (K. S. A. 60-2003.)

The allowance of attorney's fees herein is controlled by, *In re Estate of Davis,* 171 Kan. 605, 237 P. 2d 396. There a decedent's divorced wife filed a claim against his estate for specific performance of certain postnuptial contracts. The district court sustained her claim but denied anything for counsel fees. On appeal this court affirmed, saying:

"We find nothing in the section of the statute [59-1504] from which we have just quoted which can be construed as contemplating that a claimant is entitled to recover attorneys fees or other expenses incurred in the prosecution of a suit in probate court for specific performance of contracts such as are here involved. . . ." (p. 613.)

Here the appellees claim benefits made pursuant to a contract between H. W. Cardwell and Mrs. Cardwell, which they assert constitutes a claim against the estate of H. W. Cardwell, deceased. They prevailed in the trial court on their claim against the estate of H. W. Cardwell, deceased, but the trial court had no statutory authority to award the appellees' attorneys fees under these circumstances.

No appeal has been perfected from the order of the trial court awarding attorney's fees to the trustees for their attorneys. (See, K. S. A. 59-1717.)

The judgment of the lower court upholding the claim of the appellees against the estate of H. W. Cardwell, deceased, is affirmed, but as to the allowance of attorney's fees for the appellees the judgment is reversed.

FROMME, J., not participating.